**CITY OF CLEVELAND, Plaintiff,**

v.

**The CLEVELAND ELECTRIC ILLUMI-NATING COMPANY, Defendant.**

Civ. A. No. C75–560.

United States District Court,
N. D. Ohio, E. D.

Oct. 14, 1980.

William B. Norris, Hahn, Loeser, Freedheim, Dean & Wellman, James E. Young, Thomas E. Wagner, Director of Law City of Cleveland, Cleveland, Ohio, for plaintiff.

John Lansdale, James P. Murphy, Squire, Sanders & Dempsey, Cleveland, Ohio, for defendant.

### MEMORANDUM AND ORDER

KRUPANSKY, District Judge.

By memorandum filed August 29, 1980, the defendant in this antitrust proceeding, the Cleveland Electric Illuminating Company (CEI), asserts that this tribunal lacks jurisdiction over plaintiff-City of Cleveland's claim that defendant monopolized or attempted to monopolize the sale and distribution of firm retail power. By brief filed September 26, 1980, plaintiff has responded in opposition. The parties have submitted the issue to the Court for its determination upon various stipulations of fact.

Plaintiff's Second Amended Complaint charges CEI with various violations of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, in monopolizing or attempting to monopolize three purported product markets, one of which consists of the retail sale and delivery of firm power "in a substantial portion of Northeastern Ohio." *See* Second Amended Complaint ¶ 34. Defendant maintains that the firm retail power transactions identified in the complaint, which

concededly occurred exclusively within the boundaries of the State of Ohio, constitute local activity, and therefore comprise intrastate as opposed to interstate commerce. CEI further urges that § 2 of the Sherman Act proscribes only monopolization of or attempts to monopolize interstate commerce, and any § 2 claim respecting business activity of a wholly local character is beyond the jurisdictional reach of that provision. For these reasons, defendant argues that, as a matter of law, the requisite interstate commerce component of § 2 cannot be satisfied with respect to plaintiff's firm retail power claim.[1]

█ The Court initially observes that in enacting the Sherman antitrust legislation, Congress intended "to go to the utmost extent of its Constitutional power" in restraining the practices proscribed therein. *United States v. South-Eastern Underwriters Assn.*, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944) *rehearing denied*, 323 U.S. 811, 65 S.Ct. 26, 89 L.Ed. 646 (1944); *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). In considering the breadth of the interstate commerce language employed in both sections 1 and 2 of the Sherman Act, the United States Supreme Court has commented:

Language more comprehensive is difficult to conceive. On its face it shows a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states.

*United States v. South-Eastern Underwriters Assn., supra*, 322 U.S. at 553, 64 S.Ct. at 1173. More recently, in *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), the Court, after reviewing nearly a "century of Sherman Act experience," noted that as concepts of legislative power under the Commerce Clause have developed and broadened, the scope of Sherman Act coverage has expanded correspondingly:

The broad authority of Congress under the Commerce Clause has, of course, long been interpreted to extend beyond activities actually *in* interstate commerce to reach other activities, while wholly local in nature, nevertheless substantially *affect* interstate commerce. This Court has often noted the correspondingly broad reach of the Sherman Act. During the near century of Sherman Act experience forms and modes of business and commerce have changed along with changes in communication and travel, and innovations in methods of conducting particular businesses have altered relationships in commerce. Application of the Act reflects an adaptation to these changing circumstances. (citations omitted).

[2] In accordance with these expanding concepts of Sherman Act influence, two separate and distinct tests have developed for determining whether the requisite interstate commerce component thereof has been satisfied. To establish the jurisdictional element of a Sherman Act claim, the plaintiff must demonstrate either (1) that the proscribed activities are actually "in" or part of interstate commerce, *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39 (5th Cir. 1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Radiant Burners, Inc. v. Peoples Gas Lgt. & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *In re Western Liquid Asphalt Cases*, 487 F.2d 202 (9th Cir. 1973), *reversed on other grounds, sub. nom. Gulf Oil Corp. v. Copp Paving Co., supra*, 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 or (2) that the defendant's business activities in general substantially affect interstate commerce. *McLain v. Real Estate Bd. of New Orleans, supra; Cf. Hos-*

---

1. Defendant does not contest the interstate commerce component of plaintiff's § 2 claims respecting the purported wholesale sales and regional power exchange markets identified in the Second Amended Complaint. *See* Defendant's Trial Memorandum on Jurisdiction, p.1, n.1.

*pital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

Defendant initially contends that due to the distinctly different nature of the interstate commerce language incorporated in § 2 (as contrasted with § 1), the "effects on commerce" test is inapplicable thereunder. According to the defendant, only the more circumscribed "in commerce" criterion obtains under that provision for determining the existence of the jurisdictional element. While defendant correctly observes that the interstate commerce language utilized in § 1 is dissimilar to that employed in § 2, however, the notion advanced herein that such a difference in wording compels that separate jurisdictional tests be applied under each provision is without legal precedent.

At the outset, the Court notes that the judicial pronouncements which have addressed the interstate commerce issue have consistently analyzed the Sherman Act in its generic sense without differentiating between the various provisions and subsections thereof in terms of jurisdictional requirements. *See, United States v. South-Eastern Underwriters Assn., supra,* 322 U.S. at 553, 64 S.Ct. at 1173; *Mandeville Island Farms, Inc. v. American Crystal Sugar, supra; Bain v. Henderson,* 621 F.2d 959 (9th Cir. 1980); *Feminist Women's Health Center v. Mohammad,* 586 F.2d 530 (5th Cir. 1978), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). Those authorities have consistently treated the interstate commerce requirements of 15 U.S.C. §§ 1 and 2 as identical and have uniformly concluded "that the jurisdictional [element] of the . . . Act may be satisfied under either the 'in commerce' or the 'effect on commerce' theory." *McLain v. Real Estate Bd. of New Orleans, supra,* 100 S.Ct. at 509. For instance, in *Hospital Building Company v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the United States Supreme Court posited:

> The Sherman Act prohibits every contract, combination, or conspiracy "in restraint of trade or commerce among the

several States," 15 U.S.C. § 1, and also prohibits monopolizing "any part of the trade or commerce among the several States." 15 U.S.C. § 2. It is settled that the Act encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce. "[W]holly local business restraints can produce the effects condemned by the Sherman Act." As long as the restraint in question "substantially and adversely affects interstate commerce," the interstate nexus required for Sherman Act coverage is established. " 'If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' " (Citations omitted)

And, in *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), the Fifth Circuit Court of Appeals explained:

> Having concluded that the complaint sufficiently sets forth a cause of action, we must now decide whether there is "some insuperable bar to relief" which justified the district court's dismissal . . . . Initially, we confirm the district court's judgment that it had subject matter jurisdiction under §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act. With respect to the Sherman Act, jurisdiction is established either by the proscribed activities actually being in interstate commerce, or the activities, when considered in the aggregate, have a substantial effect on interstate commerce . . . . Even if the proscribed activity is purely intrastate in character, such activity falls within the jurisdictional scope of the Sherman Act when there is a substantial impact on interstate commerce. (Citations omitted).

*Id.* at 47.

Moreover, in *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra,* the United States Supreme Court specifically employed an "effects on commerce" analysis in determining that plaintiffs had satis-

fied the jurisdictional nexus of their § 2 claim charging monopolization of the predominantly intrastate northern California sugarbeet industry. More recently, in *Hospital Building Co. v. Trustees of Rex Hospital, supra*, in the context of a suit alleging *inter alia* an attempt to monopolize the local hospital business in the Raleigh, North Carolina area in violation of 15 U.S.C. § 2, the Supreme Court again applied the "effects on commerce" test in ascertaining whether the jurisdictional component of that provision had been met.

■ Apparent from the foregoing authorities is the principle that whichever section of the Sherman Act is invoked by a plaintiff, satisfaction of the interstate commerce element may be accomplished pursuant to either the "in commerce" or the "effects on commerce" criterion.

Defendant's contention that the principles enunciated in *Gulf Oil Corp. v. Copp Paving Co., Inc., supra*, compel a departure from this doctrine is without merit. In *Copp Paving*, plaintiff was engaged in the intrastate business of processing and selling asphaltic concrete. It was conceded that the product was manufactured of components produced and purchased entirely within the boundaries of the State of California and that asphaltic concrete could only be marketed locally. Plaintiff initiated suit pursuant to §§ 1 and 2 of the Sherman Act as well as §§ 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18 and § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a) charging the defendants with various acts of price fixing, discriminatory pricing, tying arrangements and attempts to monopolize the Los Angeles area asphaltic concrete market. As noted in the Supreme Court's opinion, "Copp's jurisdictional showing rested solely on the fact that some of the streets and roads in the Los Angeles area are segments of the federal highway system, and on a stipulation that a greater than *de minimus* amount of asphaltic concrete is used in their construction and repair." 95 S.Ct. at 396. The Supreme Court granted certiorari limited to the jurisdictional issues presented under the Rob-

inson-Patman and Clayton Acts. 415 U.S. 988, 94 S.Ct. 1586, 39 L.Ed.2d 885. Applying a more restrictive interstate commerce test, that tribunal merely held that the aforementioned jurisdictional assertions were insufficient to satisfy the interstate commerce element of the Robinson-Patman Act, and suggested that the same narrow analysis would apply in considering the jurisdictional component of the Clayton Act. Nowhere in its opinion however did the Court suggest that the interstate commerce requirements of § 2 of the Sherman Act were more limited than those applicable under § 1.

■ Furthermore, CEI's attempt to draw an analogy between the Supreme Court's interstate commerce analysis of the Robinson-Patman provision and § 2 of the Sherman Act is ill-conceived. Unlike the Sherman antitrust legislation, neither the Robinson-Patman nor the Clayton Act provisions have been construed in correlation with the full reach of the Commerce Clause. To the contrary, the interstate commerce language of the Robinson-Patman Act has been consistently accorded a "far narrower construction" than that obtaining under the Sherman Antitrust Act. *Lehrman v. Gulf Oil Co.*, 464 F.2d 26, 36–37 (5th Cir. 1972) *quoting from Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 208–209 (5th Cir. 1969); *see also S & M Materials Co. v. Southern Stone Co., Inc.*, 612 F.2d 198, 200 (5th Cir. 1980); *Willard Dairy Corp. v. National Dairy Products Corp.*, 309 F.2d 943, 946 (6th Cir. 1962), *cert. denied*, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963); *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140 (5th Cir. 1973), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973); *Borden Co. v. FTC*, 339 F.2d 953 (7th Cir. 1964). Similarly, "[w]ith respect to jurisdiction under the Clayton Act, it is normally recognized that [its] jurisdictional basis is somewhat narrower than that of the Sherman Act." *Battle v. Liberty National Life Insurance Co., supra*, 493 F.2d at 49; *United States v. American Building Maintenance Industries*, 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975) ("The phrase 'in commerce' does not,

of course, necessarily have a uniform meaning whenever used by Congress.").

■ For these reasons, this Court finds that the Supreme Court's pronouncement in *Copp Paving* affords no basis for adopting the restrictive § 2 jurisdictional analysis urged herein by the defendant. Rather, the Court concludes that satisfaction of either the "in commerce" or the "effect on commerce" criterion will suffice to give it jurisdiction over plaintiff's firm retail power claim.

The parties have entered *inter alia* the following stipulations of fact relating to the interstate commerce issue:

50. CEI is interconnected directly or indirectly with other electric utility systems in a substantial part of the United States. CEI regularly engaged in acts in the interstate commerce of the United States.

51. For a period of at least the past ten years: (a) CEI has owned almost all the facilities in the area it serves for transmitting and distributing power to all its customers; (b) CEI has had interconnections with Ohio Edison, Ohio Power Company and Pennsylvania Electric Company ("Penelec"); (c) CEI's interconnections with Ohio Edison and its participation in CAPCO transmission facilities permit interchange of electric power with the other members of CAPCO and transmission of power from the CAPCO group generating units owned in part by CEI; (d) CEI's interconnection with Penelec has provided for transmission of power to and from CEI's 80% owned Seneca pumped storage power plant located in Pennsylvania; and (e) interconnections of CEI have provided the means for the interchange of electric power with other utilities in Ohio, Pennsylvania and in other states.

54. Muny Light in the past and CEI now purchases and for some years in the past has purchased substantial quantities of fuel from suppliers located in states other than Ohio.

55. The CAPCO transmission system is planned and constructed to facilitate power flows between CAPCO members including those located in Ohio and Pennsylvania and between CAPCO members and other utilities.

56. CEI's transmission system runs throughout its service area.

57. CEI has sold large quantities of electric power and energy to the PJM pool which includes utilities located in Pennsylvania, New Jersey, and Maryland.

58. CEI has engaged in efforts to attract industries from other states to locations in its service area.

59. CEI utilizes power generated at its pumped storage hydro unit in Pennsylvania to serve customers in Ohio.

60. CEI or utilities with which it is interconnected frequently schedule interstate power transfers.

61. Wholly apart from scheduled transfers and "control area method of power regulation" attempts to insure that the control area supplies or contracts for its own area load. This control method, of and by itself, does not determine the flow over specific boundary ties. Energy may be flowing in over one tie and out over another. Other control actions may be necessary to limit tie flows to their capacity.

62. CEI owns 80% of the Seneca plant a pumped storage hydroelectric generating facility in Pennsylvania. In such a plant water is pumped into an elevated reservoir during times (such as late night hours) when the company's most efficient generation can supply energy for the purpose and such water is then used to generate energy at times of heavy demand on the company's generating capacity, thereby minimizing the amount of generation needed from the company's least efficient generating plants.

63. A portion of the energy which is sold at retail in the City of Cleveland and CEI's service area is generated from plants out of state.

64. CEI's transactions with other members of the CAPCO group in coordinated operation and development are in interstate commerce.

175. For more than 10 years, CEI has, from time to time, transmitted power from companies west of CEI to the Pennsylvania-Jersey-Maryland ("PJM") group.

176. From time to time, Ohio Edison has transmitted power from Toledo Edison, West Penn Power and Dayton Power & Light Company to CEI.

177. Two of the five members of CAPCO are located in the state of Pennsylvania. CEI regularly engages in power sales and purchases with the Pennsylvania CAPCO members.

178. CEI is part owner of CAPCO generating stations constructed in Pennsylvania.

■ In ascertaining whether either or both of the aforementioned jurisdictional tests are satisfied by the stipulated facts set forth above, the Court finds it appropriate, at this juncture of the proceedings, to utilize the directed verdict analysis applicable under Rule 50(a), Fed.R.Civ.P., namely whether reasonable minds could differ as to the conclusions to be drawn from the evidence. *Pergola v. Pennsylvania R. R. Co.,* 311 F.2d 837, 838–839 (6th Cir. 1963); *Morelock v. NCR Corp.,* 586 F.2d 1096 (6th Cir. 1978).

■ "[A]n apparently local activity will be considered 'in interstate commerce' when it is an essential component of an inseparable interstate activity." *Bain v. Henderson,* 621 F.2d 959, 960 (9th Cir. 1980); *McLain v. Real Estate Bd. of New Orleans, supra,* 100 S.Ct. at 510; *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) *rehearing denied,* 423 U.S. 886, 96 S.Ct. 162, 46 L.Ed.2d 118 (1975). Applying this criteria, and for the reasons developed more fully below, the Court finds that reasonable minds could not disagree that the dissemination of firm retail power as alleged in the Second Amended Complaint is "in" interstate commerce and therefore within the jurisdictional reach of § 2 of the Sherman Act. In this regard, the Court finds the reasoning of the United States Supreme Court in *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951) particularly persuasive. In

that case, the defendant newspaper company had attempted to monopolize the local dissemination of news and advertising within the Lorain, Ohio area. Noting that much of the news was of a national or international character and that a portion of the advertising was designed to promote products manufactured out of state, the Court found an attempt to monopolize interstate commerce:

> There can be little doubt today that the immediate dissemination of news gathered throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale. The local dissemination of such news and advertising requires continuous interstate transmission of materials and payments, to say nothing of the interstate commerce involved in the sale and delivery of products sold.

> \*   \*   \*   \*   \*   \*

> The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved. (citations omitted).

*Id.* at 151–152, 72 S.Ct. at 185.

Similarly, it is beyond dispute that the transmission of electrical energy throughout a substantial portion of the nation by means of an integrated network of interconnected power lines is part and parcel of interstate commerce. *See* Stipulations Nos. 50, 51, 55, 59, 60, 64, 175–177. Certainly, the local retail distribution of power originating from sources outside the State of Ohio comprises "an inseparable part of the flow of the interstate commerce involved." *See* Stipulation No. 63. Accordingly, the Court concludes as a matter of law that the requisite interstate commerce component of § 2 of the Sherman Act has been satisfied with respect to plaintiff's firm retail power claim pursuant to the "in commerce" test.

■ Application of the "effects on commerce" analysis reflects an even more expansive interpretation of the jurisdictional reach of the Sherman Act. To satisfy this test, the evidence must demonstrate "as a matter of practical economics" that the defendant's overall business activities in electrical energy "have a not insubstantial effect on the interstate commerce involved." *McLain v. Real Estate Bd. of New Orleans, supra,* 100 S.Ct. at 511; *Hospital Building Co. v. Trustees of Rex Hospital, supra,* 425 U.S. at 745, 96 S.Ct. at 1852; *Bain v. Henderson, supra,* 621 F.2d at 961; *Western Waste Service v. Universal Waste Control,* 616 F.2d 1094, 1097 (9th Cir. 1980). In applying this criteria, the Court finds instructive the Supreme Court's pronouncement in *Mandeville Island Farms, Inc. v. American Sugar Co., supra,* wherein that tribunal addressed a similar interstate commerce issue in the context of a § 2 claim respecting monopolization of the local sugar beet industry in northern California. 68 S.Ct. at 227–228, the Court succinctly summarized the positions of the parties:

> Broadly petitioners regard the entire sequence of growing the beets, refining them into sugar and distributing it, under the arrangements set forth, as a chain of events so integrated and taking place in interstate commerce or in such close and intimate connection with it that, for purposes of applying the Sherman Act, the complete sequence is an entirety and no part of it can be segregated from the remainder so as to put it beyond the statute's grasp.

> Respondent, on the contrary, broadly severs the phase or phases of growing and selling beets from the later ones of refining them and of marketing the sugar. The initial growing process together with sale of the beets, and it would seem also the intermediate stage of refining, are taken to be "purely local", since all occurred entirely within California; therefore were wholly intrastate events; and consequently were beyond the Sherman Act's reach.

> *Connected with this severance is the assertion that the complaint alleges no*

> *monopolistic or restrictive effects upon interstate commerce, but only such effects in the intrastate phases of the industry.*

> Much stress is laid upon the so-called interruption of the sequence at the refining stage. Prior to the interruption only beets are involved, afterward only sugar. Since the two commodities are different and all that affects the beets takes place in California, including the restraints alleged upon their sale, the trade and commerce in beets is wholly distinct from that in sugar and is entirely local, as are therefore the restraint and monopolization of that trade. Admittedly once the beets are converted into sugar and the sugar starts on its interstate journey to the tables of the nation, interstate commerce becomes involved. But only then is it affected, and nothing occurring before the journey begins or at any rate before the beets become sugar substantially affects or, for purposes of the statute's application, has relevance to that commerce.

In rejecting the respondent's attempt to artificially fragment the sugar beet business into separate and isolated phases, Justice Rutledge drew the "obvious distinction ... between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states." *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., supra,* 334 U.S. at 236–237, 68 S.Ct. at 1006 *quoting from United States v. Frankfort Distilleries,* 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945). The Court further elaborated:

> The inquiry whether restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented.

> \* \* \* \* \* \*

The Shreveport doctrine did not contemplate that restraints or burdens become or remain immune merely because they take place as events prior to the point in time when interstate commerce begins. Exactly the contrary is comprehended, for it is the effect upon that commerce, not the moment when its cause arises, which the doctrine was fashioned to reach.

\* \* \* \* \* \*

And even if it is assumed that the final aim of the conspiracy was control of the local sugar beet market, it does not follow that it is outside the scope of the Sherman Act. For monopolization of local business, when achieved by restraining interstate commerce, is condemned by the Act.

*Id.* at 235–236, 68 S.Ct. at 1005–1006. Accordingly, for purposes of applying the "effects on commerce" analysis, the aforesaid firm retail power transactions must not be viewed in isolation from the remainder of defendant's business endeavors. Rather, the local dissemination of firm retail power comprises an inseparable element of defendant's overall business activities which in turn are dependent upon and inextricably interwoven with the interstate transmission of electrical power. *See* Stipulations Nos. 50, 54, 55, 59, 60, 63, 64, 176, and 177. Moreover, the foregoing stipulations establish "as a matter of practical economics" that CEI's business activities in general generate a more-than-insubstantial impact on the interstate flow of electrical energy, *see* Stipulations Nos. 50, 54, 55, 57–64, 175–178, and that defendant purchases "substantial quantities" of generating fuel from out of state sources. *See* Stipulation No. 54. Certainly, the quantity of electrical energy flowing into the state from out of state sources as well as the quantity and frequency of interstate purchases of generating fuel could reasonably be expected to fluctuate in accordance with the defendant's activities in the local firm retail power market.

The Court therefore finds that reasonable minds could reach no conclusion other than that the "effects on commerce" criterion is satisfied by the aforementioned stipulated facts and that this Court therefore possesses jurisdiction over plaintiff's § 2 claim respecting the firm retail power market.

For the foregoing reasons, the Court concludes as a matter of law that the interstate commerce provisions of § 2 of the Sherman Antitrust Act have been satisfied with respect to all claims asserted by plaintiff in the Second Amended Complaint.

IT IS SO ORDERED.